Daniel B. Olmos (CA SBN: 235319)
NOLAN BARTON OLMOS & LUCIANO LLP
600 University Avenue
Palo Alto, CA 94301
(t) 650-326-2980
(f) 650-326-9704
(e) dolmos@nbo.law

Attorney for Defendant
ELIJAH DOMINGUEZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIJAH DOMINGUEZ,<br><br>Defendant. | Case No.  4:24-cr-00412 WBS<br><br>**SENTENCING MEMORANDUM**<br><br>Date:  April 29, 2026<br>Time:  2:00 p.m.<br>Dept:  4 |

Defendant Elijah Dominguez, through counsel, respectfully submits this Sentencing Memorandum to assist the Court with respect to the April 29, 2026, sentencing hearing in this matter.  Mr. Dominguez requests that the Court take into consideration this memorandum in determining a reasonable, just, and appropriate sentence in this case.  For the reasons set forth below, Mr. Dominguez respectfully requests a sentence of time served.

## I.    PROCEDURAL HISTORY

Mr. Dominguez is charged by Indictment with two counts of threatening to assault or murder a United States judge or other official in violation of 18 U.S.C. § 115(a)(1)(B) and (b)(4).  *See* Docket No. 11.  The charges relate to emails that Mr. Dominguez sent in June 2024 to the courtroom deputy of a United States Magistrate Judge.  On April 9, 2025, the Court found Mr.

Dominguez not competent to stand trial and ordered that he be committed to the custody of the Attorney General. *See* Docket No. 68. On February 25, 2026, the Court found that Mr. Dominguez's competence had been restored and discharged him from the custody of the Attorney General. *See* Docket No. 98. On the same date, pursuant to a plea agreement, Mr. Dominguez entered a plea of guilty to both counts in the Indictment. *See* Docket Nos. 95, 97. A sentencing hearing is currently scheduled for April 29, 2026. As of the filing of this memorandum, Mr. Dominguez has been in federal custody for more than 21 months.

## II.     SOCIAL HISTORY

### A.     Early Life

Elijah Dominguez was born on May 4, 1992, in Santa Rosa, California to parents Maria Felix and Jason Dominguez. He is the eldest of three children; he is one year older than his brother Joshua, and three years older than his sister Rebecca. Elijah was born to teenaged parents – Maria was 17 years old, and Jason 18. Maria and Jason's lives were turbulent. At the time of her pregnancy with Elijah, Maria was on probation for driving under the influence. Previously adopted, she was also in the process of reconciling with her biological mother. Jason had various family members who struggled with addiction, including his own mother. He moved homes constantly. When Maria became pregnant, she moved into Jason's home in Santa Rosa. Their relationship was on-and-off, with Jason leaving the home constantly. Seeking stability, Maria left and briefly stayed at women's shelter. She eventually secured consistent housing through her supervisor at work, where Maria lived for free in exchange for nannying her supervisor's children.

Elijah's birth was difficult. After a long labor, he was born not breathing and had to be resuscitated. Although nothing further was noted in his newborn examination, Elijah's infancy was troubled. He grew normally, even acquiring the nicknames "Bam-Bam" and "Biggie" for his size, but struggled with other milestones. Elijah crawled much later than other children, finally beginning to walk at 18 months. He also exhibited some behavioral problems, struggling with potty training and even smearing poop from his diaper onto the wall. Maria and Jason, being young first-time parents, were ill-equipped to deal with Elijah's behavioral issues. Even as Maria

and Jason welcomed Joshua into the family, their situation was still unstable.  Jason continued to be an on-and-off presence in the family, at times living and working in a shared apartment with Maria and, at others, living with his parents.  The family also struggled financially; neither Maria nor Jason completed high school, and they survived primarily on welfare.  When Maria became pregnant with Rebecca, she and Jason abruptly moved to Vancouver, Washington, and married.  There, Maria got her high school diploma and began CNA training.  It was a brief, impulsive stint, and the family eventually moved back to California for more family support.

By the time Elijah entered school at the Las Juntas Elementary in Martinez, his living situation had stabilized.  The family secured Section 8 housing, and Maria began working as a caregiver to an older woman who also had children with behavioral needs.  Now in Martinez, the family lived close to Maria's mother and Jason's sister.  Having relatives help with childcare was a huge relief for Maria.  By that point, Elijah's behavior made it so that he was unable to enroll in traditional daycare.  Elijah constantly bickered with his siblings, calling them vulgar names and getting into petty fights.  When this behavior began to spill over into his school life, Maria finally arranged for Elijah to be seen by a psychologist.  He was diagnosed with ADHD in the 3rd grade.  After being referred to a psychiatrist, Elijah was subsequently diagnosed with OCD and Tourette's Syndrome.  He was soon transferred to special-ed classes and began receiving speech therapy and medication.  Additionally, Maria implemented holistic remedies like acupuncture to curb medication side effects, including drowsiness and appetite increase.  The new regimen somewhat helped; Elijah was able to attend school and participate in activities such as basketball.

**B.     Middle School and High School**

Following elementary school, Maria enrolled Elijah in the Counseling and Education Program (CEP) at Floyd I. Marchus School.  The program extended into high school and provided specialized education for students with significant needs.  While in CEP, Elijah received extra support from his multiple instructors, therapists, and counselors. The program was a tremendous resource, but Elijah's behavior remained a source of stress for his family.  His relationship with Joshua and Rebecca was turbulent, and as they became older, they expressed resentment due to

Elijah's emotional outbursts.  Maria and Jason had divorced at this point, and Maria essentially became a single parent.  Overwhelmed, Maria decided to enroll Elijah into an intervention program, Families First.  The program, based in Utah, was a residential facility where high-need minors could temporarily live and receive services from caregivers and medical professionals.  Elijah stayed at Families First for a few months, returning to California after reports of abuse at the facility.  Elijah himself experienced mistreatment from caregivers in the form of verbal abuse.  This experience left Elijah deeply traumatized, planting a seed of mistrust in authority figures.

Following his stay at Families First, Elijah completed his middle school education at Marchus.  He was enrolled into the special education program at Olympic High School in Concord, but eventually transferred back to Marchus.  He experienced relative stability with the help of strict medical, educational, and therapeutic regimen.  When his schedule would stray, so would he—mostly, in the form of verbal outbursts toward his family.  In extreme cases, Elijah's outbursts would result in a 5150 hold.  Otherwise, life proceeded as it always did for Elijah, with ups and downs.  He continued to enjoy basketball, and spending time with his extended family.  Elijah was especially close to Maria's mother, his grandmother, and Jason's brother-in-law, his uncle.

### C.    Young Adult Life

After graduating from Marchus, Elijah aged out of many behavioral programs.  Maria soon enrolled him in a day program where young, high-need adults could receive work training.  Elijah engaged in the program semi-consistently, eventually landing an as-needed job stocking an antique shop.  He also took a course at Diablo Valley Community College.  Overall, however, the transition from child to adult mental treatment was a challenging transition for Elijah.

Now completely in charge of his own treatment, he stopped taking medication consistently, opting to self-medicate with marijuana.  He also became inconsistent with therapy and psychiatry appointments.  When Elijah was 20 years old, his grandmother—Maria's mother—passed away, exacerbating matters.  The loss was devastating for Elijah; in a family where he often felt isolated from others, his grandmother was a close friend.  It was around this time when

Elijah began experiencing symptoms of paranoia and schizophrenia.  He had a sense of always being under threat, either by larger forces or his own family.  Managing Elijah's behavior as an adult became extremely difficult.  Seeking respite, Maria began searching for residential programs where Elijah could live semi-independently.  She eventually secured Elijah a placement at River House in Martinez, where he was also set up with an adult mental health mentor.  River House was close enough that Maria was able to visit Elijah regularly to help with apartment maintenance.

During his time at River House, Elijah mostly lived as an independent adult.  He continued to stock the antique store occasionally and often spent time walking around Martinez.  Elijah especially enjoyed going to the library and conversing with the local homeless population.  Elijah always had a deep sense of compassion for the less fortunate.  While on his daily walks in Martinez, he would often give homeless residents clothing, food, and other items.

Elijah also began attending local court hearings and town meetings.  He was interested in gaining a closer look at how systems operated, and how they affected people.  It was at one of these attendances that Elijah met Joe, who was associated with a radical, anti-justice-system political group.  Elijah quickly found mentorship in Joe; he had found an outlet to further his interest in human rights issues.  This relationship, however, was ultimately unhealthy.  What began as a genuine sense of compassion quickly escalated as a result of the group's radical politics.  Elijah started internalizing extreme beliefs about the government, the courts, and law enforcement.  Combined with his paranoid and schizophrenic thinking, these ideas took on a heightened sense of urgency.  His drive to uncover corruption became obsessive, resembling patterns seen during his more severe episodes of OCD.  He spent increasing amounts of time in libraries, frequently disappearing into online rabbit holes that reinforced and deepened his fixations.

At the age of 24, Elijah met a woman named Melissa at a town meeting.  About ten years older and a well-known dog park advocate in Martinez, she shared his interest in community involvement.  Elijah felt deeply seen by her.  Melissa overlooked many of the traits that had socially isolated him in his youth, including his speech impediment and awkwardness.  They fell

in love, and for Elijah—new to relationships—the pace quickly intensified.  Soon, Melissa became pregnant.

When she shared the news, she told Elijah she was uncertain whether he or another man was the father, explaining that she had not considered their relationship exclusive.  Elijah reacted with an extreme outburst, directing a series of offensive remarks at her.  Alarmed, Melissa distanced herself and cut off contact.  At the time, Elijah's family was unaware of the situation.

**D.    First Incident with Law Enforcement**

Naturally, Elijah's downward spiral continued.  It was during this time in 2016 that Elijah had his first incident with law enforcement.  He had always been familiar with the police; his first 5150 was in 2006 and now he had regular interaction with officers while homeless.  This incident, however, was distinct.  In the throes of his worsening OCD and paranoia, Elijah lashed out at a courthouse officer, resulting in felony obstruction and battery charges.  Ultimately, the charges resulted in a misdemeanor conviction.  Elijah's family had pooled together their resources to hire a private attorney, and Maria was desperate to clarify that the most pertinent threat Elijah had was to himself.  While incarcerated, Elijah was transferred to Napa State Hospital where he was diagnosed with schizophrenia and bipolar disorder, as well as paranoid-delusional with narcissistic tendencies.

While Elijah was at Napa State Hospital, Melissa reached out to Maria about her child, a daughter named Juliette.  Melissa and Maria agreed to have her undergo parental testing, which eventually determined that Elijah was indeed Juliette's father.  Maria, while overjoyed to be a grandmother, was apprehensive.  Elijah was simply not equipped to navigate the responsibilities of adulthood, much less fatherhood.  Elijah, on the other hand, was elated at the news.  He met his daughter for the first time while still in custody.

After Elijah's release, he reconnected with Melissa and the pair restarted their relationship and moved in together.  Due to his probation status, Elijah was unable to live in Maria's Section 8 apartment, and also could not live at River House.  Somewhat stabilized, Elijah felt motivated to be present in Juliette's life.  He continued with the Assisted Outpatient Treatment he began at

Napa State Hospital, and went on weekend outings with Melissa, Juliette, and Maria.  Elijah especially enjoyed ice skating and mini golfing with Juliette.

Ultimately, Maria's concerns proved true.  Elijah experienced frequent mental breakdowns, often triggered by lapses in medication.  He became increasingly obsessive and paranoid about his own safety and that of his family, at times convinced he was under government surveillance.  This continued for roughly eight months, until Melissa asked Elijah to leave the home obtained a restraining order.  Because he did not have custody of Juliette, Elijah had no ability to establish terms for contact with his daughter.

### E.    Worsening Mental Health

Following his split with Melissa, Elijah experienced on-and-off homelessness.  Maria and Jason arranged for motel stays on occasion, and for short visits to their homes.  Elijah's mental state was highly unpredictable.  At times, he was somewhat functional.  He stayed in contact with Juliette, as allowed by Melissa, and continued to go on monthly outings with her.  He also maintained a friendship with another homeless man, Cameron, whom Elijah knew from his special education days.  But, without a stable routine, Elijah's mental state continued to decline.  He stopped therapy and medication.

During this time, Elijah's behavior continued to result in interactions with the justice system.  Obsessed with the idea of corruption, he filed several frivolous lawsuits against individuals, organizations, and local governments.  In 2019, Elijah was arrested for attempting to enact a "citizen's arrest" on the mayor of Martinez.  The incident escalated, and Elijah subsequently was charged with battery and obstruction, among other charges.  By that point, he had become somewhat notorious in Martinez for his disruption and confrontations in town meetings.  It was clear then that he needed mental support rather than criminal consequences.  He underwent two forensic competency evaluations, in which his diagnoses were upheld.  Ultimately, however, he was declared competent to stand trial.  After about six months in custody, Elijah took a plea deal and was placed back on probation.

Following his release, Elijah's inconsistent living situation continued.  He split his time between homelessness, living with his mother Maria, and at times with his father Jason.  Elijah's behavior remained unmanageable and, in 2021, he experienced his fourth 5150 hold.  The call was deeply traumatic for Elijah, and it brought up memories of mistreatment by authority figures.  As with his two previous altercations with the police, Elijah felt compelled to fight for his life.  He was again arrested for battery and obstruction, and his probation was extended.  By this point, Maria and Jason had recognized the cyclical pattern of Elijah's behavior.  It was often that such outbursts were preceded by a stressor Elijah was simply not equipped to process healthfully— usually, grief from a lost relationship.  In this case, Elijah experienced the sudden loss of an older friend, with whom he spoke daily.  Feeling aggrieved by the world, Elijah would lash out.  It was no coincidence, in Maria and Jason's minds, that this was often directed toward authority figures.

While Elijah's parents understood the complexity of his situation, translating that understanding into effective care proved difficult.  His extensive list of diagnoses, compounded by ongoing legal issues and the severity of his symptoms, exceeded the capacity of most programs, let alone what Maria and Jason could manage on their own.  After his fourth 5150 hold, Elijah moved in with Jason, where he stayed for about a year.

During this period, his schizophrenia and bipolar disorder worsened.  His delusions intensified, including claims that he owned multiple businesses and was a Republican presidential candidate. A series of incidents followed: Elijah filed an unfounded lawsuit against the Contra Costa County Library and began posting conspiratorial content online.  He also initiated several civil suits against Jason, convinced that his father was surveilling him.  This ultimately resulted in a restraining order that, in effect, left Elijah homeless once again.

### F.    Current Incident

Maria and Jason never lost contact with their son, bringing food and clothing whenever they could.  In the summer of 2024, Elijah was arrested for sending threatening emails that form the basis of this case.  There had been a prior incident in which he sent threatening messages to President Donald Trump, prompting a visit from the Secret Service to Maria's home.  The later

emails, however, were more explicit.  Elijah was arrested by the U.S. Marshals and taken to Santa Rita Jail, where he underwent a forensic psychological evaluation and was deemed incompetent to stand trial.

He was subsequently transferred to the Metropolitan Detention Center (MDC) in Los Angeles, then to the Federal Medical Center (FMC) Devens—a federal facility for inmates requiring mental health care—and later returned to MDC.  At FMC Devens, a second evaluation confirmed that he remained incompetent to stand trial.  The experience of incarceration was deeply distressing for Elijah.  Frequent transfers made it difficult for him to maintain contact with his family, who were often unaware of his whereabouts.  Mistreatment by other inmates further exacerbated his mental state, contributing to periods of suicidal ideation.  Throughout this time, Elijah felt isolated and unheard.

Despite these challenges, his family has remained steadfast in their support.  Maria has consistently maintained that Elijah needs comprehensive mental health care, not prolonged incarceration.  At his core, Elijah has a strong sense of justice and a desire to advocate for others. He is a passionate writer, and someone who is inclined to give to others even when he has little himself.  While a full recovery may be uncertain, his family remains hopeful that these qualities can be channeled into a meaningful and constructive role in society.

In recent months, Elijah has resumed communication with his daughter.  His family hopes he will once again gain access to the kind of structured support he received earlier in life, along with a sustainable, long-term plan for medication and therapy.

## III.    DISCUSSION

### A.    Plea Agreement and Probation Recommendations

The plea agreement calculates an Adjusted Offense Level of 12, which, combined with a Criminal History Category IV[1], yields a Guidelines range of 21 to 27 months.  *See* Docket No. 97 at 5.  The parties agree not to seek any departure from that offense level.  *Id*. at 4.  The government has agreed to recommend a sentence of time served, followed by a three-year term of

---

[1] The parties did not reach an agreement regarding Mr. Dominguez's Criminal History Category.  The PSR calculated a Criminal History Category of IV.  Mr. Dominguez does not object to that calculation.

supervised release. *Id*. at 7. In addition, the parties agree, among other conditions, that Mr. Dominguez must participate in an outpatient health treatment program and continue to take all mental health medications that are prescribed by his treating physician. *Id.* at 5.

In the PSR, the United States Probation Office recommended a sentence of time served and a three-year term of supervised release. *See* Docket No. 97 at 19. Probation notes that, at the time of sentencing, Mr. Dominguez will have served approximately 21 months and 24 days in federal custody. *Id.* Probation also recommends, *inter alia*, the following special conditions: (1) Mr. Dominguez must reside for a period of up to 180 days, upon his release from federal custody, in a residential reentry center as directed by his probation officer; (2) Mr. Dominguez must participate in an outpatient mental health treatment program, as directed by his probation officer; and (3) Mr. Dominguez must take all mental health medications he is prescribed by his treating physician, and must report any changes to his mental health medications to his probation officer with 24 hours of becoming aware of such change. *Id*. at 22. Mr. Dominguez does not object to any of these recommended special conditions.

**B.    Sentencing Guidelines and 18 U.S.C. § 3553(a)**

The United States Sentencing Commission was charged by Congress with the task of establishing guidelines that would carry out the basic sentencing objectives contained in 18 U.S.C. § 3553(a). *See United States v. Rita*, 551 U.S. 338, 347 (2007). Those objectives include, *inter alia*, "certainty and fairness," avoiding unwarranted sentencing disparities, and permitting "individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." *Id*. at 348. Although the Court must consult the Sentencing Guidelines in considering a fair and just sentencing for Mr. Dominguez, it should be guided primarily by the factors enumerated in 18 U.S.C. § 3553(a). *United States v. Gall*, 552 U.S. 38 (2007). Under that statute, the Court must fashion a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing. Here, a sentence of time served satisfies that mandate.

Under § 3553(a)(1), the Court considers the nature and circumstances of the offense and the history and characteristics of the defendant. Mr. Dominguez acknowledges the seriousness of his offenses and accepts responsibility for his conduct. His personal history reflects longstanding mental health challenges, which have at times contributed to interpersonal difficulties and prior interactions with law enforcement. The Presentence Investigation Report recognizes that "Mr. Dominguez's mental health issues significantly influenced his involvement in the instant offense, as well as his prior criminal history." *See* Docket No. 103 at 20. Despite these challenges, Mr. Dominguez has demonstrated a genuine concern for justice and a consistent desire to advocate on behalf of others.

Mr. Dominguez's prior encounters with law enforcement have frequently coincided with periods of acute mental health deterioration. The instant offense follows that same pattern. During the relevant period, Mr. Dominguez was experiencing a significant escalation of symptoms, including paranoia and the belief that the government was acting against him. He was also experiencing frustration stemming from what he perceived as interference by the government with his efforts to pursue justice. As the Court is aware, a doubt was declared regarding his competency shortly after the offense conduct. Although Mr. Dominguez believed at the time that he was acting in furtherance of a just cause, he now recognizes that those perceptions were not grounded in reality and fully acknowledges the seriousness of his conduct.

Under § 3553(a)(2), the Court also considers the need for the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence, protect the public, and provide the defendant with needed medical care in the most effective manner. Mr. Dominguez respectfully requests a sentence of time served and does not object to the special conditions recommended by Probation, including that he (1) reside in a residential reentry center upon his release from federal custody, (2) participate in outpatient mental health treatment, and (3) continue taking his mental health medication as prescribed by his treating physician. The goals of deterrence and public safety are best served by ensuring that Mr. Dominguez remains engaged in consistent, structured

mental health treatment.  Continued incarceration would not meaningfully advance those objectives and may, in fact, undermine his progress.

Considering the § 3553(a) factors as a whole, a sentence of time served is warranted.  Such a sentence is sufficient, but not greater than necessary, to achieve the purposes of sentencing, and will allow Mr. Dominguez to continue addressing the underlying factors contributing to his conduct while working toward a stable, productive, and law-abiding future.

**IV.    CONCLUSION**

For the foregoing reasons, Mr. Dominguez respectfully requests that the Court impose a sentence of time served.

Dated:  April 22, 2026                              Respectfully submitted,

                                                             NOLAN BARTON OLMOS & LUCIANO, LLP


                                                             */s/ Daniel B. Olmos*
                                                             Daniel B. Olmos
                                                             Attorney for Defendant Elijah Dominguez